NOT FOR PUBLICATION                                                                                    (Doc. No. 4)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____

C.O. TRUXTON, INC.,                                   :
                                                                  :
        Plaintiff,                                        :    Civil No. 14-4231 (RBK/AMD)
                                                                  :
v.                                                              :
                                                                  :    **OPINION**
BLUE CARIBE, INC. and BLUE                    :
PHARMACEUTICALS, LLC,                         :
                                                                  :
        Defendants.                                    :
_____:

**KUGLER**, United States District Judge:

      This matter comes before the Court on the motion of Defendants Blu Caribe, Inc. and Blu Pharmaceuticals, LLC (collectively "Defendants"), to dismiss Plaintiff C.O. Truxton, Inc.'s ("Truxton") Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3), or in the alternative to transfer this case pursuant to 28 U.S.C. § 1404(a) (Doc. No. 4). The subject of this action is Truxton's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, intentional and negligent misrepresentation, and accounting against Defendants. The claims involve Defendants' alleged failure to remit profits to and execute a purchase and supply agreement with Truxton, in accordance with the terms of the Memorandum of Understanding at issue in this case. For the reasons set forth below, the present motions to dismiss and motion to transfer will be dismissed as moot. Though this Court finds that

venue in New Jersey is improper under 28 U.S.C. § 1391(b), it will transfer this case to the United States District Court, Western District of Kentucky, pursuant to 28 U.S.C. § 1406(a).

## I. FACTUAL BACKGROUND

This matter arises out of a contract between Plaintiff C.O. Truxton, Inc. and Defendants Blu Caribe, Inc. ("Blu Caribe") and Blu Pharmaceuticals, LLC ("Blu Pharmaceuticals"). Truxton is a New Jersey corporation, headquartered in Bellmawr, New Jersey, while Blu Caribe is a Puerto Rico corporation, headquartered in Dorado, Puerto Rico, and its parent company, Blu Pharmaceuticals, a Kentucky limited liability company, is headquartered in Franklin, Kentucky. (Compl. ¶¶ 1-3; see also Affidavit of Paul F. Devine ("Devine Aff.") ¶ 3; Certification of Joseph William Luster ("Luster Cert.") ¶¶ 2-4 (describing Blu Pharmaceuticals as an "affiliate" of Blu Caribe).)[1] Defendants share management and financing, and have acted interchangeably with Truxton with respect to the contract and transactions at issue in this lawsuit. (Compl. ¶ 8.)

Truxton is a wholesale distributor of pharmaceutical products, and as part of its business, purchases pharmaceutical products directly from the manufacturer and sells pharmaceutical products to other distributors, drug stores, and medical and veterinary providers nationwide. (Compl. ¶ 6; Devine Aff. ¶ 9.) Defendants are affiliated pharmaceutical companies in the business of manufacturing generic pharmaceutical

---

[1] Blu Pharmaceuticals apparently acquired or created Blu Caribe in January 2010, when it acquired an existing manufacturing facility in Puerto Rico. (Ex. 4 to Pl.'s Opp'n, Blu Pharmaceuticals Website Image.)

2

products at Blu Caribe's production facility in Dorado, Puerto Rico. (Compl. ¶ 7; Luster Cert. ¶¶ 5-6.)

Prior to February 12, 2013, Truxton was the FDA-registered owner of the Abbreviated New Drug Application ("ANDA") #A062269 for Doxycycline Hyclate 50 mg and 100 mg tablets (the "Product"). (Compl. ¶ 9; Devine Aff. ¶ 10.) The Product is an FDA approved antibiotic which is prescribed for use in both the human and veterinary markets. (Compl. ¶ 11.)

In mid-2012, Jose Suarez, an employee of Blu Caribe, telephoned Gregory Devine, Truxton's Vice President of Marketing, soliciting Truxton to allow Blu Caribe to manufacture the Product under contract for Truxton. (Devine Aff. ¶ 11.) Then, in the fall of 2012, Blu Pharmaceuticals sent a former employee, Joe Dombrowski, to meet with Devine in Philadelphia, near Truxton's office, to negotiate the purchase of the ANDA. (Id. ¶ 12; see also Luster Cert. ¶ 11.) No employee, agent, or representative of Truxton ever travelled to Kentucky or Puerto Rico to solicit Defendants' business or to negotiate a contract for the sale of the ANDA. (Devine Aff. ¶ 13.) Rather, after the meeting with Joe Dombrowski, Gregory Devine drafted the February 12, 2013 Memorandum of Understanding (the "MOU") in New Jersey, and Paul F. Devine, Truxton's President, signed the MOU in New Jersey. (Id. ¶¶ 13-14; see also Ex. A to Compl., February 12, 2013, Memorandum of Understanding ("MOU").) The MOU was transmitted to Blu Pharmaceuticals and signed by Joseph William Luster ("Luster"), President of Blu Pharmaceuticals and Blu Caribe, in Franklin, Kentucky. (Luster Cert. ¶ 13.)

As per the MOU, the sale price for the ANDA was $135,000, and immediately following the execution of the MOU, Blu Pharmaceuticals wired payment for the ANDA

3

to Truxton's bank in Haddonfield, New Jersey. (Devine Aff. ¶ 16; see also MOU ¶ 1.) The MOU also provided that Truxton would receive a 20% share of the net profits from Defendants' sales of the Product for the first six months, and a 10% share of the net profits from its sales of the product for the following six months, payable to Truxton's bank. (See Devine Aff. ¶ 17; MOU ¶ 2.) Further, the MOU contained a "guaranteed & additional sales" term for a five year "Product Supply Agreement." (Id. ¶ 3) As part of that term, Truxton and Defendants agreed to finalize the Product Supply Agreement within 90 days of signing the MOU. (Id.) Also included were anticipated terms for the Product Supply Agreement, such as Truxton's commitment to purchase a minimum of two 2.2 million tablet batches of the product per year, up to a maximum of 15 batches, a guarantee that Truxton would receive at least one of Defendants' first three production batches, and the anticipated pricing to be equal to Defendants' standard Cost of Goods Sold ("COGS"). (Id. ¶ 4; see also Devine Aff. ¶ 17.)[2]

---

[2] Though the Court generally must construe facts in favor of the non-moving party on a motion to dismiss, and accept the allegations as true, that is not necessarily the case on a Rule 12(b)(3) motion to dismiss, where a plaintiff's allegations are contradicted by the defendant's affidavits. See Bockman v. First Am. Marketing Corp., 459 Fed. App'x 157, 158 n.1 (3d Cir. 2012). While all reasonable inferences should be drawn in favor of Truxton, and legitimate factual disputes resolved in its favor, on a Rule 12(b)(3) motion to dismiss the court may consider evidence outside the pleadings to determine whether venue is proper. See id.; Aggarao v. MOL Ship Mgmt. Co., Ltd., 657 F.3d 355, 365-66 (4th Cir. 2012); Ambraco, Inc. v. Bossclip B.V., 570 F.3d 233, 238 (5th Cir. 2009); 5B Charles Allan Wright & Arthur R. Miller, Federal Practice & Procedure, § 1352 (3d ed. 2012).

Truxton repeatedly refers to Defendants' unconditional obligation to manufacture and supply to Truxton a minimum of two batches per year of the Product in both the veterinary and human markets pursuant to the MOU. (See Compl. ¶¶ 14, 40, 47, 52, 58; Devine Aff. ¶¶ 17, 20.) Defendants' claim that they were not obligated to supply any of the Product to Truxton under the MOU unless a subsequent Product Supply Agreement was signed. (See Defs.' Br. at 7; Luster Cert. ¶¶ 17, 19.) Upon review of Defendants' attached certifications, the MOU, particularly paragraphs 3 and 4 therein, and the materials attached with Truxton's opposition papers, the Court does not find that the MOU obligates Defendants to do what Truxton claims, without certain conditions being met—namely finalizing and executing a Product Supply Agreement in the first instance. (See, e.g., MOU ¶ 4 ("Supply and Pricing for the Supply Agreement …") (emphasis added); id. ¶ 3 ("Please consider the following as guaranteed & additional sales—Truxton and BLU will finalize a 5 year Product Supply Agreement for [the Product]") (emphasis added); Ex. B to Compl., October 21, 2013 Jeffery S. Craig Email ("Oct. 21 Email") ("Under [the] MOU … [Defendants] and Truxton undertook and made certain covenants to each other in good faith concerning … the agreement to enter into a five (5) year

Pursuant to paragraph 3 of the MOU, Truxton prepared a Product Supply Agreement to memorialize Truxton's exclusive distribution rights for the Product, a draft of which was sent to Blu Caribe in July 2013. (Compl. ¶ 15; Devine Aff. ¶ 18; Luster Cert. ¶ 23.) Though the terms of the MOU were contingent on the FDA's approval of the ANDA for Blu Caribe, (see MOU), Defendants refused to execute or negotiate the Product Supply Agreement after receiving FDA approval of the product on November 25, 2013, and despite receiving three separate letters/emails from Truxton's counsel in New Jersey inquiring as to the status of the Product Supply Agreement. (Compl. ¶¶ 16-23; Devine Aff. ¶ 19.)

Truxton learned that Defendants were in fact selling the Product on the market without supplying Truxton with one of the first three batches, allegedly in violation of the MOU. (Compl. ¶ 24; Devine Aff. ¶ 21.) As a result, and in an attempt to protect its own market share and customer base, Truxton issued a Purchase Order for various batches of the Product to be shipped to Truxton in New Jersey. (Compl. ¶ 24; Ex. G to Compl., Purchase Order ("Purchase Order"); Devine Aff. ¶ 21.) In an email Luster acknowledged receipt of this Purchase Order on December 6, 2013, but then changed the batch size from 2.2 million tablets to 650,000 tablets, without consulting Truxton. Additionally, Luster identified the price of the product to be $485.91 per 500 tablet bottle for the first time. (Devine Aff. ¶ 22; Ex. H to Compl., Luster Purchase Order Email ("Luster P.O. Email").) Truxton objected to the price quoted by Luster, as the COGS listed was

---

supply agreement with [ ] specific purchase and supply requirements under which Truxton would agree to purchase a minimum and maximum number of [batches of the Product] for resale and [Defendants] would agree to manufacture and supply same for sale by Truxton in the veterinary and human markets.").) Because Truxton's own materials belie its allegations on this point and support Defendants' position, the Court does not accept this allegation as true for the limited purpose of determining venue.

apparently close to thirty times more than the COGS for similar products. (Compl. ¶¶ 26-27; Exs. I and J to Compl., Devine Emails; Devine Aff. ¶ 23.)

In a further effort to maintain its market share, Truxton sent an Amended Purchase Order to Defendants' counsel on January 8, 2014, ordering 300 bottles containing 500 tablets each, at Blu Caribe's quoted price of $484.91, with instructions that the Product be shipped to Truxton in New Jersey. (Compl. ¶¶ 31-32; Ex. K to Compl., January 8, 2014, Jeffery S. Craig Email ("Jan. 8 Email"); Devine Aff. ¶ 25.) On January 14, 2014, Blu Pharmaceuticals issued an invoice for 300 bottles of the Product to be shipped to Truxton in New Jersey, and on January 16, 2014, Truxton remitted payment of $145,773 for the Product to Blu Pharmaceuticals. (Compl. ¶ 32; Ex. L to Compl., Invoice; Devine Aff. ¶ 26.)

Despite Truxton's repeated written and verbal requests for documentation to confirm the COGS for the Product, Defendants refused to reveal to Truxton the basis of their quoted COGS. (Compl. ¶¶ 33-37; Devine Aff. ¶ 24.) Because Defendants never responded to Truxton's requests for documentation to support its COGS or confirm its profits, as anticipated under the MOU, Truxton retained Michael Saccomanno, CPA, a forensic accountant in New Jersey, to review Defendants' COGS and Blu Pharmaceuticals sales records. (Compl. ¶¶ 33-34; see also Ex. 8 to Pl.'s Opp'n, Michael Saccomanno Document Request and Jeffery S. Craig Cover Letter ("COGS Request"); Devine Aff. ¶ 27.) On February 21, 2014, Truxton's counsel sent an audit request for financial documents to Defendants' counsel, asking that Defendants provide the requested documents within 30 days. (Compl. ¶ 35; COGS Request.) Defendants also

never responded to the accountant's request for documentation of Defendants' COGS or their profits. (Compl. ¶ 36; see also Devine Aff. ¶ 27.)

Truxton filed its original Complaint in the Superior Court of New Jersey, Camden County, Law Division on April 20, 2014. (See Compl.) Truxton's Complaint asserts six causes of action: breach of contract (Count I); unjust enrichment (Count II); intentional misrepresentation (Count III); negligent misrepresentation (Count IV); breach of the implied covenant of good faith and fair dealing (Count V); and accounting (Count VI). (Compl.) On July 3, 2014, Defendants filed a notice of removal, and on August 1, 2014, Defendants filed the instant motion to dismiss. Defendants have moved to dismiss Truxton's Complaint for lack of personal jurisdiction, pursuant to Fed. R. Civ. Pro. 12(b)(2), and for improper venue, pursuant to Fed. R. Civ. P. 12(b)(3). (Defs.' Br. at 1.) In the alternative, if this Court finds that venue is proper in the District of New Jersey, Defendants move to transfer this action to the Western District of Kentucky, pursuant to 28 U.S.C. § 1404(a). Because this Court finds that venue is improper in New Jersey, but transfer to the Western District of Kentucky under § 1406(a) is appropriate, it will not address Defendants' remaining claims.

## II. LEGAL STANDARD

On a 12(b)(3) motion to dismiss for improper venue, the burden is on the moving party to show that venue is improper. Bockman, 459 Fed. App'x at 160 (citing Myers v. Am. Dental Ass'n, 695 F.2d 716, 724–25 (3d Cir. 1982)). Importantly, venue must be proper as to each claim. See, e.g., Cmty. Surgical Supply of Tom's River, Inc. v. Medline Diamed, LLC, No. 11–221, 2011 WL 3235706, at *3 (D.N.J. July 28, 2011). In considering a Rule 12(b)(3) motion, a court must generally accept a complaint's

allegations as true, unless contradicted by the defendant's affidavits, and a court may consider facts outside the complaint, but all reasonable inferences must be made in the plaintiff's favor. See Bockman, 459 Fed. App'x at 158 n.1.[3]

### III. DISCUSSION

Defendants move to dismiss for improper venue, pursuant to Fed. R. Civ. P. 12(b)(3). As discussed below, the Court finds that venue is improper in New Jersey under 28 U.S.C. § 1391(b), but it will transfer this case to the Western District of Kentucky pursuant to 28 U.S.C. § 1406(a). Accordingly, the Court declines to address the merits of Defendants' motions to dismiss for lack of personal jurisdiction and to transfer pursuant to § 1404(a), and it will dismiss all of Defendants' motions as moot.

#### a. Motion to Dismiss Under Rule 12(b)(3) for Improper Venue

#### i. Improper Venue Pursuant to § 1391(b)

Pursuant to Fed. R. Civ. P. 12(b)(3), this Court may dismiss an action for improper venue. Under 28 U.S.C. § 1391(b), the statute governing venue in diversity cases, venue is proper if Truxton brought this action in: "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." § 1391(b).

---

[3] See cases cited supra note 2.

Both parties acknowledge that in this case, § 1391(b)(1) is not applicable, as neither Defendant resides in the same state. Nor does it appear to this Court that § 1391(b)(3) permits venue to lie in New Jersey. As noted infra, Blu Pharmaceuticals is incorporated in Kentucky and is subject to personal jurisdiction there. Based on the business relationship between Blu Caribe and Blu Pharmaceuticals, and the extent of Blu Caribe's business and contacts with Kentucky, Blu Caribe is subject to specific personal jurisdiction in Kentucky as well.[4] Because it appears, as discussed below, that a substantial portion of the acts or omissions relevant to the present matter occurred in the Western District of Kentucky, Truxton could have brought this action in that district, and venue would have been appropriate there under § 1391(b)(2). Therefore, § 1391(b)(3) cannot apply to any venue. Thus, the Court is left to discuss only whether venue may also be appropriate in New Jersey under § 1391(b)(2), or whether Defendants have shown that the substantial part of the events or omissions giving rise to Truxton's claim did not occur therein.

According to the Third Circuit, "[t]he test for determining venue [under § 1391(b)(2)] is not the defendant's 'contacts' with a particular district, but rather the location of those 'events or omissions giving rise to the claim.'" Cottmann Transmission Sys., Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994). "In assessing whether events or omissions giving rise to [a] claim[ ] are substantial, it is necessary to look at the nature of the dispute." Id. at 295. Thus, "the venue provision 'favors the defendant in a venue dispute by requiring that the events or omissions supporting a claim be substantial,"

---

[4] See infra note 8.

Bockman, 459 Fed. App'x at 161 (quoting Cottmann, 36 F.3d at 294-95), and events or omissions that have only "some tangential connection" with the dispute are not sufficient to support venue under § 1391(b)(2). Id. at 294. "Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no relationship to the dispute." Id.; see also Leroy v. Great W. United Corp., 443 U.S. 173, 183-84 (1979) (noting that the purpose of the venue provision is "to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial").

With respect to breach of contract of claims, "courts considering substantial events or omissions may take into account where the contract was negotiated, executed, performed, and breached." Stalwart Capital, LLC v. Warren St. Partners, LLC, No. 11-5249, 2012 WL 1533367, at *4 (D.N.J. 2012) (citing J.F. Lomma, Inc. v. Stevenson Crane Servs., Inc., No. 10-3496, 2011 WL 463051, at *4-5 (D.N.J. Feb.3, 2011); CLP Packaging Solutions, Inc. v. Sports Pouch Beverage Co., No. 07-1532, 2008 WL 2095774, at *2-4 (D.N.J. May 16, 2008)); see also Cottman, 36 F.3d at 295 (considering where contract on which plaintiff based its state-law claims was executed and performed and where defendant failed to return various materials and remit payment). Though in-person meetings can be substantial events, electronic and telephonic negotiations between two districts do not necessarily create a substantial event. See, e.g., CLP, 2008 WL 2095774, at *3 (finding no venue in New Jersey where email and telephone negotiations occurred in New Jersey and Pennsylvania and face-to-face meetings occurred in California, Nevada, and Florida). Additionally, in a situation where a party has allegedly failed to make a payment, the locus of the action is where the party failed take that action

rather than where the result is felt.  See Cottman, 36 F.3d at 295; see, e.g., CLP, 2008 WL 2095774, at *4.

The Court finds that the acts or omissions relevant to Truxton's claims all substantially occurred outside New Jersey.  First, the unjust enrichment claim deals only with Defendants' alleged overcharging of Truxton for the amended Purchase Order.  (See Compl. Count II.)  As with failure to remit payment, this Court considers that the relevant acts or omissions involved with unjustly profiting from another substantially occur where a defendant's decision to overcharge took place.  Cf. CLP, 2008 WL 2095774, at *4 (noting that where defendant failed to send payment to plaintiff for outstanding invoices, the significant location was where "the failure to pay decision" occurred.)  Here, those acts took place in Kentucky, where Defendants communicated the revised batch size and COGS amount to Truxton.  (See Luster Cert. ¶¶ 25-26.)  Likewise, Truxton's intentional misrepresentation and negligent misrepresentation claims, while relating in part to representations made concerning Defendants' intention to supply Truxton with the Product in New Jersey, can only be said to have occurred at the place where Defendants made their alleged misrepresentations.  (See Compl. Counts III-IV.)  Because no party has offered evidence suggesting that Defendants traveled to or were in present in New Jersey to negotiate or misrepresent their intentions,[5] the Court considers such

---

[5] To the extent that Truxton relies on the initial contact regarding the purchase of the ANDA for the Product, made by Jose Suarez in 2012, on behalf of Blu Caribe, such a communication did not occur in person, or in New Jersey.  See, CLP, 2008 WL 2095774, at *3.  Nor do any of Truxton's claims appear to involve the initial negotiations in any way.  (See generally, Compl. Counts I-V (describing Defendants alleged violations in failing to perform under the MOU and/or negotiate and execute a Product Supply Agreement).)  Similarly, the one individual who apparently met with Truxton, on behalf of Defendants, near New Jersey, was apparently there only to negotiate the purchase of the ANDA, not the terms of a supply agreement.  (See Devine Aff. ¶ 12; Luster Cert. ¶ 11.)  Based on the substantiality of these events viewed in light of the overall nature of this dispute, the Court does not find that these were substantial acts or omissions occurring in New Jersey, as referred to in § 1391(b)(2).  See Cottman, 36 F.3d at 295.

misrepresentations, if they occurred, to have happened at arms-length, and likely in either Kentucky or Puerto Rico, where Defendants primarily do business. (See Luster Cert. ¶¶ 14-15.) As for Truxton's accounting claim, it involves Defendants' failure to confirm its net profits from sales of the Product and remit the required profits to Truxton, as well as Truxton's inability to purchase specified quantities of the Product at prices equal to the standard COGS, due to Defendants' failure to confirm or supply its financial information. (See Compl. Count VI; Devine Aff. ¶¶ 24, 27; COGS Request.) While Truxton alleges that payments were not made, and financial information was not provided, the substantial events are considered to have occurred where Defendants made those omissions, in Kentucky, not where their effect was felt. See Stalwart Capital, 2012 WL 1533367, at *4; see also Cottman, 36 F.3d at 295.

Even Truxton's contract claims, which explicitly refer to the alleged requirement that Defendants' ship the Product to New Jersey, involve more, and indeed more "substantial," acts or omissions that did not occur in New Jersey. Defendants' misrepresentations concerning, or outright failure to complete a Product Supply Agreement, to pay Truxton's share of the net profits as provided in the MOU, and to meet the minimum manufacturing requirements contemplated under the MOU, as well as overcharging Truxton and inflating prices not contemplated in the MOU, all involved acts or omissions by Defendants in Kentucky. (See Compl. Counts I, V; Defs.' Rep. Br. at 11; Luster Cert. ¶¶ 30-31 ("For reasons not attributable to either Defendant, the proposed supply agreement was not executed by Blu Pharmaceuticals or Truxton. … All of Blu Pharmaceuticals' major business decisions are made at its Kentucky facility, including its decision to execute the MOU with Truxton, purchase the ANDA from

Truxton, and not to execute the supply agreement with Truxton.").) Both parties agree that Defendants never signed a Product Supply Agreement. (See Devine Aff. ¶ 19 ("Defendants refused to execute or negotiate the Product Supply Agreement in breach of the MOU and in violation of the implied covenant of good faith and fair dealing."); Luster Cert. ¶ 17.) Without such an agreement in place, it can hardly be said that a substantial amount of the acts required under the MOU occurred in New Jersey. In fact, with respect to these claims, no acts had yet occurred in this district. The Court agrees that, even with respect to the contract claims, most of the substantial acts or omissions occurred outside of this forum and in the Western District of Kentucky. (See Defs.' Br. at 13.)

  The only claimed acts or omissions that could be considered to have occurred in New Jersey do not provide sufficient grounds for proper venue in this Court. In Truxton's breach of contract claim, the Complaint alleges Defendants, in part, "refus[ed] to supply [Truxton's] minimum requirements of the Product under the MOU." (Compl. Count I; see also Devine Aff. ¶ 17, 20 (stating the MOU obligated Blu Caribe to sell to Truxton and "ship to New Jersey millions of tablets of the Product") (emphasis added).) Similarly, the breach of the implied covenant of good faith and fair dealing claim allegedly involved Defendants' "dealings with [Truxton] while performing the MOU," which based on other allegations in the Complaint, could incorporate Defendants' failure to supply batches of the Product to Truxton in New Jersey. (See Compl. Count V.) Yet, as described above, these aspects of the breach are only a part of Truxton's contract claims, and a particularly small part, considering the unpersuasive support Truxton has provided for its allegation that Defendants' supply obligations existed apart from an

13

executed Product Supply Agreement.[6] Nor is this Court convinced that failure to receive shipments of the Product is an act or omission that actually occurs at the place of failed delivery, in this case New Jersey. Rather, where all that is due to Truxton in New Jersey is payment of certain profits and shipment of product, the Court considers the omissions giving rise to the claimed breach to have occurred where Defendants failed to send payment or ship the products from—Kentucky.[7] See Cottman, 36 F.3d at 295 ("The omissions that Cottman cites—Martino's failure to return various materials and failure to remit payments—actually occurred in Michigan, not in Pennsylvania. Even though the result was Cottman's non-receipt of those items in Pennsylvania, the omissions bringing about this result actually occurred in Michigan. Although this conclusion may seem to

---

[6] See supra note 2.

[7] While the record is somewhat ambiguous regarding whether Blu Caribe was to ship the Product directly to Truxton, or whether Truxton was to receive its supply of the Product through Blu Pharmaceuticals, the Court finds that the available evidence strongly suggests the Product was to be manufactured and packaged by Blu Caribe in Puerto Rico first, and then sent to Blu Pharmaceuticals in Kentucky for distribution, including supplying Truxton.

For instance, Truxton's documented interactions with Defendants after signing the MOU indicate that Truxton was expecting to buy the Product from Blu Pharmaceuticals. (See MOU ¶ 4 (stating in part, "BLU agrees to supply Truxton with 2 batches of product per year, with a BLU Label," and signed on behalf of Blu Pharmaceuticals as "BLU"); Oct. 21 Email (only addressing concerns and purported supply obligations under the MOU to "Blu Pharmaceuticals"); Purchase Order (addressed to Blu Pharmaceuticals); Luster P.O. Email (noting Truxton shipped labels to Blu Pharmaceuticals in Kentucky for labeling and repackaging in Kentucky with respect to its Purchase Order); but see MOU ¶ 3 ("This product will be packaged, labeled and distributed by Truxton and/or one or more of its partners and subsidiaries.").) Defendants also aver that the contemplated supply relationship involved manufacture and packaging of the Product in Puerto Rico and then shipment to Kentucky for distribution. (Defs.' Br. at 2 (citing Luster Cert. ¶ 16).)

While Truxton contends that Blu Caribe was supposed to ship the Product directly to New Jersey, (see Devine Aff. ¶ 20), it is not clear that it is differentiating between Blu Caribe and Blu Pharmaceuticals, as Truxton's affidavit repeatedly states that it communicated with Blu Caribe concerning the alleged issues with performance of the MOU obligations, and submitted the Purchase Order to Blu Caribe. In light of the supporting documents submitted by both Truxton and Defendants, the Court finds this to be either a misstatement or an oversight. Instead, based on the records of the communications with Blu Pharmaceuticals, the terms of the MOU, and the circumstances surrounding the Purchase Order, the Court considers Kentucky to be the place where any omission on behalf of Defendants to ship supplies of the Product to Truxton in New Jersey would have occurred.

hinge on a question of 'whether the glass is half full or half empty,' we fail to see how these omissions could 'give rise' to the claims that Cottman presents.")

Taken as a whole, each claim in the Complaint involves substantial acts or omissions which occurred outside the District of New Jersey, and no substantial acts or omissions that occurred within the district. Rather, it appears that the substantial acts or omissions relevant to the claims in Truxton's Complaint actually occurred within the Western District of Kentucky. (See Defs.' Br. at 13; Luster Cert. ¶¶ 30-31.) Because the substantial events giving rise to each of Truxton's claims against Defendants occurred outside the District of New Jersey, venue is not proper in New Jersey under § 1391(b)(2).

### ii. Transfer Pursuant to 28 U.S.C. § 1406(a)

Finding that venue is improper in New Jersey, however, does not end this Court's analysis. According to 28 U.S.C. § 1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." § 1406(a). "Transfer in lieu of dismissal is generally appropriate to avoid penalizing plaintiffs by 'time-consuming and justice-defeating technicalities.'" Bockman, 459 Fed. App'x at 162 n.11 (quoting Goldlawr, Inc. v. Heiman, 369 U.S. 463, 467 (1962)); see also J.F. Lomma, 2011 WL 463051, at *5 ("Transfer is generally more in the interest of justice than dismissal.") (internal quotation marks omitted).

The Court finds that this action could have originally been brought in the Western District of Kentucky. Personal jurisdiction exists over both Defendants in Kentucky. (See Defs.' Br. at 15 ("Blu Pharmaceutical … is subject to personal jurisdiction in [the Western District of Kentucky]"); see also Lester Cert. ¶¶ 2-6 ("[Luster] hold[s] the

position of President of Blu Pharmaceuticals and Blu Caribe … Blu Caribe manufactures high-quality generic pharmaceuticals at its Puerto Rico facility. … Blu Pharmaceuticals distributes high-quality generic pharmaceuticals manufactured by Blu Caribe at Blue Pharmaceuticals' facility in Franklin, Kentucky.").)[8]  As discussed at some length above,

---

[8] Personal jurisdiction may be either general or specific. Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 200–01 (3d. Cir. 1998). Specific jurisdiction is established when a nonresident defendant has "purposefully directed" his activities at a resident of the forum and the injury arises from, or is related to, those activities. See Burger King Corp. v. Rudzewiczi, 471 U.S. 462, 472 (1985). To comport with the requirements of Due Process, a plaintiff must show that (1) the nonresident defendant has "certain minimum contacts with [the forum state]" and that (2) "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

First, to establish personal jurisdiction over a nonresident defendant, there must be sufficient "minimum contacts" between the defendant and the forum state to justify suit. See Int'l Shoe Co., 326 U.S. at 316. The minimum contacts requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff. See World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297–98 (1980). Put differently, there must be some act or acts by which a defendant "purposefully avails itself of the privilege of conducting activities in the forum State," Hanson v. Denckla, 357 U.S. 235, 253 (1958), such that the defendant should "reasonably anticipate being haled into court" there. World–Wide Volkswagen Corp., 444 U.S. at 297.

"Specific jurisdiction is established when a non-resident defendant has 'purposefully directed' his activities at a resident of the forum and the injury arises from or is related to those activities." Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001) (quoting Burger King, 471 U.S. at 472). Questions of specific jurisdiction are properly tied to the particular claim asserted. In a contract case, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach. General Elec. Co., 270 F.3d at 150. "Parties who 'reach out beyond their state and create continuing relationships and obligations with citizens of another state" are subject to the regulations of their activity in that undertaking.'" Id. (quoting Burger King, 471 U.S. at 473). Courts may consider several factors to determine whether the defendant purposefully maintained sufficient contacts with the forum, including "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Budget Blinds, Inc. v. White, 536 F.3d 244, 261 (3d Cir. 2008) (quoting Burger King, 471 U.S. at 479). Additionally, "where a long-term relationship has been established, actual territorial presence becomes less determinative." Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006) (citing General Elec. Co., 270 F.3d at 151).

Here, the Court finds that Blu Caribe has the requisite minimum contacts with the Western District of Kentucky in order to be subject to specific personal jurisdiction there. It is owned by Blu Pharmaceuticals, which is located in Kentucky, presided over by the same individual who also presides over Blu Pharmaceuticals in Kentucky, and directs its regular and continuous drug manufacturing and packaging output to Blu Pharmaceuticals' distribution facility in Kentucky.

The Court also finds that exercising personal jurisdiction over Blu Caribe in Kentucky would not be inconsistent with "traditional notions of fair play and substantial justice." Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987) (requiring minimum contacts and fairness in order to assert personal jurisdiction). Factors to be considered include the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering

the substantial acts or omissions giving rise to Truxton's claims also primarily, if not entirely, occurred in Kentucky. Thus, venue in the Western District of Kentucky would be proper under § 1391(b)(2).

Because transfer to the Western District of Kentucky is appropriate and will facilitate a decision on the merits in this case, the Court concludes that this case should be transferred to the United States District Court, Western District of Kentucky, pursuant to § 1406(a). Therefore, Defendants' motion to dismiss for improper venue will be dismissed as moot.

### b. Motions to Dismiss for Lack of Personal Jurisdiction and to Transfer Venue Pursuant to 28 U.S.C. § 1404(a)

Since the Court will transfer this case to the Western District of Kentucky, it declines to address the merits of Defendants' motion to dismiss for lack of personal jurisdiction. See Goldlawr, 369 U.S. at 466 ("The language of § 1406(a) is amply broad enough to authorize the transfer of cases, however wrong the plaintiff may have been in filing his case as to venue, whether the court in which it was filed had personal jurisdiction over the defendants or not.") Similarly, the Court declines to address Defendants' alternative argument that, although venue is proper in New Jersey, the case

---

fundamental substantive social policies. See id. at 113. A nonresident defendant who has been found to have minimum contacts with the forum "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 177. Blu Caribe likely could not show that it is unjustly burdened by having the case litigated in Kentucky, as the witnesses and evidence Defendants intend to rely on are primarily located in Kentucky. (See Luster Cert. ¶¶ 41, 43.) In fact, Defendants both have asked to transfer this case to the Western District of Kentucky in part for that very reason. (Defs.' Br. at 13-18.) Nor do any other factors present a compelling reason why exercising personal jurisdiction over Blu Caribe in Kentucky would be unjust or unreasonable. As such, the Court finds that the Western District of Kentucky has personal jurisdiction over Blu Caribe in this matter.

should be transferred to the Western District of Kentucky for the convenience of the parties under § 1404(a). Accordingly, these motions will be dismissed as moot.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss pursuant to Rules 12(b)(2) and 12(b)(3), and motion to transfer pursuant to § 1404(a), will be **DISMISSED AS MOOT**. This matter will be transferred to the United States District Court, Western District of Kentucky, pursuant to 28 U.S.C. § 1406(a). An accompanying Order shall issue.


Dated:  12/5/2014                                   s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge